**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| STEMCELLS, INC. *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>NEURALSTEM, INC. *et al.*,<br><br>        Defendants. | Civil Action No. 8:06-cv-01877-AW<br><br>Member Cases:<br><br>8:08-cv-02664-AW<br><br>8:08-cv-01173-AW |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, StemCells, Inc. and StemCells California, Inc. assert this action against three Defendants: Neuralstem, Inc.; Karl Johe; and Richard Garr. Plaintiffs assert claims for, inter alia, patent infringement. Several motions are outstanding. They include: (1) Defendants' Motion for Leave to File a First Amended Answer and Counterclaims (Doc. No. 198); (2) Defendants' Motion to Dismiss (Doc. No. 202); (3) Plaintiffs' Motion for Summary Judgment on Standing (Doc. No. 237); (4) Defendants' Cross-Motion for Partial Summary Judgment on Standing; (5) Plaintiffs' Motion for Reconsideration of Claim Construction (Doc. No. 256); (6) Defendants' Motion to Supplement the Record in Support of their Cross-Motion for Partial Summary Judgment on Standing; and (7) Plaintiffs' Cross-Motion to Supplement the Record in Support of their Motion for Summary Judgment on Standing. The Parties have exhaustively briefed the abovementioned motions; the Court deems no hearing necessary. For the reasons articulated herein, the Court takes the following action in respect of the outstanding motions. The Court: (1)

**GRANTS** Defendants' Motion for Leave to File a First Amended Answer and Counterclaims;

(2) **DENIES AS MOOT** Defendants' Motion to Dismiss; (3) **DENIES** Plaintiffs' Motion for

Summary Judgment on Standing; (4) **DENIES** Defendants' Cross-Motion for Partial Summary

Judgment on Standing; (5) **HOLDS IN ABEYANCE** Plaintiffs' Motion for Reconsideration of

the Court's Claim Construction; (6) **GRANTS** Defendants' Motion to Supplement the Record in

Support of their Cross-Motion for Partial Summary Judgment on Standing; and (7) **GRANTS**

Plaintiffs' Cross-Motion to Supplement the Record in Support of their Motion for Summary

Judgment on Standing.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, StemCells, Inc. and StemCells California, Inc. (collectively "StemCells") filed

a complaint in case number 06-1877-AW on July 24, 2006. Doc. No. 1. In the Complaint,

StemCells alleged that Defendant Neuralstem, Inc. (Neuralstem) infringed the following U.S.

Patent Nos.: 5,581,832, 6,294,346; 6,497,872; 7,101,709.[1] Both StemCells and Neuralstem are

companies that research and develop stem cell therapeutics. StemCells is a Delaware corporation

with its primary place of business in Palo Alto, California. Neuralstem is a Delaware corporation

whose principal place of business is in Rockville, Maryland.

On September 20, 2006, StemCells filed an amended complaint alleging that, in addition

to the abovementioned patents, Neuralstem infringed U.S. Patent No. 6,103,530 (the '530

patent). Doc. No. 20.  Neuralstem answered and counterclaimed on October 30, 2006. Doc. No.

32. In its counterclaim, Neuralstem asserted a claim for violation of § 2 of the Sherman Antitrust

Act. Neuralstem also asserted counterclaims for noninfringement and invalidity.

On June 19, 2007, the Parties agreed to stay the action pending reexamination

proceedings in the United States Patent & Trademark Office (USPTO) of the patents in suit. On

---

[1] The Court abbreviates these patent numbers as follows: '832, '346, '872, and '709.

April 22, 2008, the USPTO issued U.S. Patent No. 7,361,505 (the '505 patent) to Neurospheres

Holdings, Ltd. (Neurospheres).[2] StemCells purports to be Neurospheres' exclusive licensee for

the '505 patent.

The following day, StemCells issued a press release announcing the issuance of the '505

patent. In this press release, StemCells asserted that third parties would have to seek a license

from it if they wished to make commercial use of their patented neural stem technology. In

response, on May 7, 2008, Neuralstem filed a declaratory judgment action in this Court. *See*

*Neuralstem, Inc. v. StemCells, Inc. et al.*, 8-01173-AW, Doc. No. 1. Through this declaratory

judgment action, Neuralstem sought the Court to declare the'505 patent unenforceable.

Hours later, StemCells filed a complaint in the Northern District of California. *StemCells,*

*Inc. et al. v. Neuralstem, Inc. et al.*, 08-02664-AW, Doc. No. 1. In this complaint, StemCells

alleged that Neuralstem and its founders, Karl Johe and Richard Garr, infringed the '505 patent,

as well as U.S. Patent No. 7,115,418 (the '418 patent). On May 9, 2008, StemCells filed an

amended complaint. *Id.*, Doc. No. 10. In the amended complaint, StemCells asserted additional

claims for trade libel and unfair competition.

On May 13, 2008, in 08-01173-AW, Neuralstem filed an amended complaint.

*Neuralstem, Inc. v. StemCells, Inc. et al.*, 08-01773-AW, Doc. No. 9. Through this pleading,

Neuralstem sought the Court's declaration that the '418 patent was unenforceable. Furthermore,

responding to StemCells' amended complaint in the California action, Neuralstem asserted

counts for declaratory judgment of nonliability for trade libel and unfair competition.

On September 11, 2008, in 08-01173-AW, StemCells filed a counterclaim and third-party

complaint. *Id.*, Doc. No. 38. StemCells modeled its counterclaim and third-party complaint after

its amended complaint in the California action. Counts I and II assert that Neuralstem, Johe, and

---

[2] Neurospheres is a predecessor in interest to StemCells of the patents in suit.

Farr infringed, respectively, the '418 and the '505 patents. Counts III-V are directed at only Neuralstem. These counts cover, respectively, trade libel, unfair competition under Maryland common law, and unfair competition under California statutory law.

In 06-1877-AW, the Parties jointly moved to reopen the case and to lift the administrative stay after the USPTO completed reexamination of the '832, '346, '872, and '709 patents in May 2009. The Court granted this motion on June 8, 2009. Additionally, on July 27, 2009, the Court consolidated StemCells' California action (08-02664-AW) and Neuralstem's Maryland action (08-01173-AW) under the lead case of 06-01877-AW. Doc. No. 97. Shortly thereafter, in 08-01173-AW, the Court issued a Memorandum Opinion and Order granting in part and denying in part Neuralstem's motion to dismiss counts three, four, and five (i.e. trade libel, unfair competition under Maryland common law, and unfair competition under California statutory law) of StemCells' counterclaim. *Neuralstem, Inc. v. StemCells, Inc. et al.*, 08-01173-AW, Doc. Nos. 63–64. The Court granted the motion as to count four and denied it as to counts three and five.

On September 1, 2009, in the lead action, Neuralstem filed an answer to StemCells' amended complaint in the California action. Doc. No. 109. The counterclaim contains six counts. Count one asserts a claim for violation of the Sherman Antitrust Act. Counts two, three, and four relatedly assert that the '505 patent is unenforceable, noninfringed, and invalid. Additionally, as in 08-01173-AW, Neuralstem asserted counts for declaratory judgment of nonliability for trade libel and unfair competition.

Approximately one week later, StemCells filed what it captions as a "third amended complaint."[3] Doc. No. 113-1. Therein, much like its previous complaints, StemCells alleges that Neuralstem infringed the '832, '346, '872, and '709 patents. In the following month, Neuralstem answered and counterclaimed. Doc. No. 121. Following in the well-worn footsteps of its prior counterclaims, Neuralstem alleges claims for violation of the Sherman Antitrust Act and declaratory judgment of unenforceability, noninfringement, and invalidity.

In the meantime, the lead case went into discovery. As the case slogged through discovery, the Parties prepared and filed *Markman* briefs. Doc. Nos. 169, 171. On August 12, 2011, the Court issued a *Markman* claim construction. Doc. No. 251. On August 26, 2011, StemCells moved for reconsideration of the Court's construction of the patent claim terms "adherent" and "of." Doc. No. 256.

Meanwhile, on February 28, 2011, Neuralstem filed a Motion for Leave to File a First Amended Answer and Counterclaims (Motion for Leave). Doc. No. 198. Contemporaneously, Neuralstem filed a Motion to Dismiss. Doc. No. 202. In its Motion to Dismiss, Neuralstem

> moves this Court to dismiss Count 1 (Patent Infringement) of Plaintiff's Third Amended Complaint (Dkt. 113), their First and Second Counterclaims (Infringement of U.S. Patent Nos. 7,115,418 and 7,361,505, respectively) in consolidated case no 8:08-cv-01173-AW (Dkt. 38), and their First and Second Claims for Relief (Infringement of U.S. Patent Nos. 7,115,418 and 7,361,505, respectively) in consolidated case no. 8:08-cv-02664-AW (Dkt. 10) for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

*Id.* at 1.

The basis for Neuralstem's Motion to Dismiss is a 1991 document (1991 Memo) that it discovered through its own efforts in December 2010. The 1991 Memo purportedly gives Dr. Wolfram Tetzlaff a partial ownership interest in "the invention that became the subject of the

---

[3] From what the Court can tell, StemCells had filed only two complaints in the lead action prior to this time. Therefore, it is unclear why StemCells captioned this pleading as a third amended complaint. The Court need not resolve this apparent oversight as, no matter what the Parties call it, the third amended complaint moots any prior complaint in the lead case.

Patents-in-Suit." Doc. No. 203 at 10. Dr. Tetzlaff is a Canadian researcher who worked alongside Dr. Samuel Weiss and Dr. (then Mr.[4]) Brent Allan Reynolds on stem cell proliferation techniques. *See* Doc. No. 203-2 at 2.  Drs. Weiss and Reynolds are Canadian scientists who claim to be the lead inventors of the patents in suit.

The subject line of the 1991 Memo states that it concerns "Technique[s] for Proliferation of Nerve Cells for Transplantation." *Id.* The first half of the 1991 Memo states as follows:

> This letter is to indicate the allotment of interests to the inventors of the above invention.
>
> | 45% | – | Dr. Samuel Weiss, Dept. of Pathology |
> | 45% | – | Mr. Brent Allan Reynolds, Dept. of Pathology |
> | 10% | – | Dr. Wolfram Tetzlaff, Dept. of Anatomy |

*Id.* The second half of the memo goes on to state that "[t]he inventors are in agreement with this assignment which relates to 50% of any profits derived from this invention, the other 50% being assigned to the University of Calgary . . . per the current policy relating to Intellectual Property." *Id.* Drs. Tetzlaff, Weiss, and Reynolds signed the 1991 Memo on January 3, 1991. *Id.*

Neuralstem contends that, in contrast to Drs. Weiss and Reynolds, Dr. Tetzlaff never transferred his ownership interest in the invention to any of StemCells' predecessors in interest. In fact, based on this belated discovery, "on February 14, 2011, Dr. Tetzlaff granted Neuralstem, Dr. Johe, and Mr. Garr a fully paid-up, retroactive, non-royalty-bearing, nonexclusive, worldwide, nonterminable and irrevocable license to the invention embodied in U.S. Patent Application Serial No. 07/726,812, as well as all patent applications claiming priority to U.S.

---

[4] Dr. Reynolds was a graduate student in 1991.

Patent Application Serial No. 07/726,812, and all patent applications having the same disclosure and effective filing dates as U.S. Patent Application Serial No. 07/726,812." Doc. No. 203 at 13.

Neuralstem states the significance of the '812 patent as follows:

> Other documents produced during discovery confirm that the invention referred to in the January 1991 [Memo] is the invention described in the U.S. patent application filed on July 8, 1991, and assigned serial number 07/726,812 ("the '812 Application"). The '812 Application is the parent application of each of the Patents-in-Suit. *See, e.g.,* StemCells' Opening Claim Construction Brief, Dkt. 169, at p. 2 ("All of the subject patents originate from U.S. Patent Application Serial No. 07/762,812 [sic, 07/726,812] filed on July 8, 1991.").

Doc. No. 198 at 3 ¶ 7.

In its Motion to Dismiss, Neuralstem cites caselaw proposing that "[o]nly a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit." Doc. No. 203 at 6 (citation omitted). In light of the 1991 Memo and the ownership interest it purports to create, Neuralstem concludes that StemCells is a nonexclusive licensee of the patent and, hence, lacks standing to sue Neuralstem.

To be sure, StemCells responded in opposition to Neuralstem's Motion to Dismiss (Opposition to Motion to Dismiss). Doc. No. 212. StemCells makes several arguments in its Opposition to Motion to Dismiss. StemCells' lead argument is that the 1991 Memo is void under the patent code's version of the bona fide purchaser defense. *See* 35 U.S.C. § 261. The essence of this argument is that (1) Dr. Tetzlaff failed to record his ownership interest with the USPTO and (2) StemCells acquired its interest in the patents in suit without notice of Dr. Tetzlaff's purported ownership interest. Based on the language of both the 1991 Memo and the referenced university IP policy, StemCells also avers that the Memo amounts to no more than a royalty-sharing agreement. Alternatively, StemCells maintains that genuine disputes of material fact exist

regarding the meaning of the 1991 Memo and, hence, dismissal absent subsequent discovery and trial would be premature.

As these Motions pended, StemCells filed a Motion for Summary Judgment on Standing (Motion for Summary Judgment). Doc. No. 231. StemCells' memorandum in support of its Motion for Summary Judgment is a lengthy document in which StemCells more or less regurgitates the arguments that it set forth in its Opposition to Motion to Dismiss. *See* Doc. No. 232. In response, Neuralstem lodged a Cross-Motion for Partial Summary Judgment on Standing (Cross-Motion for Summary Judgment). Doc. No. 237. Much like StemCells' Motion for Summary Judgment, Neuralstem's Cross-Motion for Summary Judgment is essentially a rehash of its Motion to Dismiss. However, Neuralstem's Cross-Motion for Partial Summary Judgment is novel insofar as it filed a Rule 56(d) affidavit in which it alleges that additional discovery is necessary for them to have a fair opportunity to contest StemCells' Motion for Summary Judgment. The Parties filed responses and replies and this Motion is outstanding.

The Parties' motions practice continued. In December 2011, Neuralstem filed a Motion to Supplement the Record in Support of its Cross-Motion for Partial Summary Judgment (Motion to Supplement). Doc. No. 291. In its Motion to Supplement, Neuralstem seeks to supplement the record to include excerpts from the depositions of three witnesses whose testimony, in Neuralstem's estimation, "establishes that StemCells had notice of Dr. Tetzlaff's potential interest in the patents at issue in this case, the issue at the heart of StemCells' bona fide purchaser defense." *Id.* at 1. Fittingly, in responding to Neuralstem's Motion to Supplement, StemCells filed a Cross-Motion to Supplement the Record in Support of its Motion for Summary Judgment (Cross-Motion to Supplement) Doc. No. 299. In its Cross-Motion to Supplement, StemCells requests the Court's leave to supplement the record with a consulting agreement

between Dr. Tetzlaff and Neurospheres. Doc. No. 299-16. StemCells contends that Dr. Tetzlaff

represents in the consulting agreement that he does not own any of the subject stem cell

technology. These motions to supplement are likewise ripe for review.

## II.     STANDARD OF REVIEW

### A.     Motion to Amend

Once the scheduling deadline to file an amended complaint has passed, the moving party

must satisfy the two-prong test under Federal Rules of Civil Procedure 15(a) and 16(b)(4) in

order for the court to grant leave to amend a pleading. *See Nourison Rug Corp. v. Parvizian*, 535

F.3d 295, 298–99 (4th Cir. 2008). The moving party must meet the threshold "good cause"

standard of Rule 16(b)(4) before it can satisfy the second prong. *See id.* at 298. If the movant

satisfies Rule 16(b)(4), the movant then must pass the test for amendment under Rule 15(a). *See*

*id.* at 298–99; *see also Daso v. Grafton Sch., Inc.*, 181 F. Supp.2d 485, 488 (D. Md. 2002).

Under Rule 16(b)(4), "[a] schedule may be modified only for good cause and with the

judge's consent." Fed. R. Civ. P. 16(b)(4). The movant satisfies the good cause requirement by

showing that, despite diligence, the proposed claims could not have been reasonably brought in a

timely manner. *See Montgomery v. Anne Arundel County, Md.*, 182 Fed. App'x 156, 162 (4th

Cir. 2006). The factors a court considers in discerning good cause are the "danger of prejudice to

the non-moving party, the length of delay and its potential impact on judicial proceedings, the

reason for the delay, and whether the movant acted in good faith." *Tawwaab v. Va. Linen Serv.,*

*Inc.*, 729 F. Supp.2d 757, 768–69 (D. Md. 2010) (citation and internal quotation marks omitted).

Once the movant has met the burden of showing good cause, the court's inquiry shifts to

the standard under Rule 15(a) providing that a court should "freely give leave [to amend a

pleading] when justice so requires." Fed. R. Civ. P. 15(a). A court should deny leave to amend

"*only when* the amendment would be prejudicial to the opposing party, there has been bad faith

on the part of the moving party, or the amendment would be futile." *Edwards v. City of*

*Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (citation and internal quotation marks omitted).

## B.    Motion for Summary Judgment

Summary judgment is appropriate only "if the movant shows that there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  The Court must

"draw all justifiable inferences in favor of the nonmoving party, including questions of

credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker*

*Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come

forward with affidavits or other similar evidence to show that a genuine issue of material fact

exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A

disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Material disputes are those that

"might affect the outcome of the suit under the governing law." *Id.*

Although the Court should believe the evidence of the nonmoving party and draw all

justifiable inferences in his or her favor, the nonmoving party cannot create a genuine dispute of

material fact "through mere speculation or the building of one inference upon another." *See Beal*

*v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Further, if a party "fails to properly support an

assertion of fact or fails to properly address another party's assertion of fact as required by Rule

56(c), the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P.

56(e)(2). Finally, hearsay statements or conclusory statements with no evidentiary basis cannot

support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

C.      **Motion to Dismiss**

The purpose of a motion to dismiss is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In two recent cases, the U.S. Supreme Court has clarified the standard applicable to Rule 12(b)(6) motions. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). These cases make clear that Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3 (quoting Fed. R. Civ. P. 8(a)(2)). This showing must consist of at least "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In deciding a motion to dismiss, the court should first review the complaint to determine which pleadings are entitled to the assumption of truth. *See Iqbal*, 129 S. Ct. at 1949–50. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. In so doing, the court must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## III.    LEGAL ANALYSIS

## A.    Motion to Amend

In its Motion to Amend, Neuralstem seeks two primary forms of relief. First, Neuralstem requests the Court to grant the portions of its Motion that challenge StemCells' standing to sue for patent infringement. Second, Neuralstem asks the Court to grant the portions of its Motion that seek to augment its pleadings with (1) factual averments relating to the 1991 Memo and (2) an associated defense based on allegedly inequitable conduct. In essence, Neuralstem wishes to assert that: (1) Dr. Tetzlaff has an ownership interest in the invention; (2) Drs. Weiss and Reynolds knew this fact during the prosecution of the patents; and (3) Drs. Weiss and Reynolds falsely represented that no one else had an ownership interest in the patents.

StemCells mounts a two-prong defense to Neuralstem's Motion to Amend. Under the first prong, StemCells insists that Neuralstem cannot show good cause to amend the scheduling order. StemCells notes that the deadline for amended pleadings expired nearly a year-and-a-half before Neuralstem filed its Motion to Amend and argues that Neuralstem does not demonstrate due diligence adequate to justify this failure. Under the second prong, StemCells maintains that amending the pleadings would be an exercise in futility because Neuralstem's standing argument is meritless.

Although its efforts to contact Dr. Tetzlaff are a little lacking, Neuralstem has shown good cause to amend the scheduling order. The salient consideration is that Neuralstem has challenged StemCells' standing. "It is well-established that any party, and even the court sua sponte, can raise the issue of standing for the first time at any stage of the litigation . . . ." *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003). Therefore, assuming the viability of this defense, it would be counterintuitive to prohibit Neuralstem from

amending its counterclaim. As the subsequent discussion will show, genuine issues of material

fact surround this defense, thereby conferring it facial validity. For this reason alone, it would be

proper to grant Neuralstem's Motion to Amend.

Yet that is not the sole consideration counseling in favor of granting said Motion.

Although StemCells filed the lead case in 2006, the pertinent merits discovery did not truly begin

until June 2009. Neuralstem first attempted to contact Dr. Tetzlaff around this time and finally

succeeded in late 2010, roughly a year-and-a-half later. Even though one might characterize

Neuralstem's attempts to contact Dr. Tetzlaff as sporadic, there is no serious dispute whether

Neuralstem was actively engaged in discovery during this period. Furthermore, Neuralstem

evidently enlisted the succor of a Canadian law firm by way of contacting Dr. Tetzlaff, which is

indicative of diligence. Moreover, StemCells' argument about Neuralstem's alleged lack of

diligence appears to presuppose that (1) Neuralstem *should have known* that Dr. Tetzlaff would

produce an agreement purporting to create an ownership interest and that (2) Dr. Tetzlaff would

*in fact* produce said agreement. The first proposition is questionable considering the arguably

inconsistent declarations Drs. Weiss and  Reynolds made before the USPTO. The second

proposition, for its part, is somewhat speculative. Therefore, although Neuralstem's attempts to

contact Dr. Tetzlaff were no paragon of diligence, Neuralstem has exhibited enough diligence to

inch over Rule 16(b)(4)'s good cause threshold.

This determination does not end the analysis. At this point, courts' focus shifts to Rule

15(a)'s "when justice so requires" standard. As previously stated, courts should deny leave to

amend "*only when* the amendment would be prejudicial to the opposing party, there has been bad

faith on the part of the moving party, or the amendment would be futile." *Edwards*, 178 F.3d at

242. Here, the amendment is neither prejudicial nor futile because, inter alia, Neuralstem has

raised a standing defense concerning which genuine disputes of material fact exist. Moreover,

StemCells has submitted no evidence suggesting bad faith on the part of Neuralstem.

Accordingly, in view of all the circumstances, the Court grants Neuralstem's Motion to Amend.

**B.**      **Cross-Motions to Supplement**

As the Court discusses below, genuine disputes of material cloud the meaning of the

1991 Memo. Therefore, the Court sees no harm in granting the Parties' cross-motions to

supplement the record. Although the supplemental evidence that the Parties seek to submit fails

to resolve these factual disputes, such evidence only enhances the Court's truth-finding function.

Consequently, the Court grants the Parties' cross-motions to supplement the record.

**C.**      **Cross-Motions for Summary Judgment on Standing**

Despite having filed hundreds of pages of memoranda on the question of standing, the

Parties concede that the Court need decide just two main issues: (1) whether the 1991 Memo

gives Dr. Tetzlaff an ownership interest in the patents in suit; and (2) whether the patent code's

version of the bona fide purchaser defense voided Dr. Tetzlaff's putative ownership interest.

Doc. No. 244 at 6; Doc. No. 254 at 6. Before addressing these two questions, the Court makes

some preliminary observations regarding the doctrine of standing.

*1.      Principles of standing*

It is axiomatic that federal courts are courts of limited jurisdiction. Article III, § 2 of the

U.S. Constitution embodies a central limitation on federal courts' jurisdiction. Pertinently,

Article III, § 2 provides that federal courts' jurisdiction extends only to "cases" and

"controversies."  *See* U.S. Const. art. III, § 2. Despite functioning to limit federal courts'

jurisdiction, the concepts of cases and controversies are inherently expansive. *See Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 559 (1992). Courts have endeavored to elucidate the

meaning of these twin terms even as they remain mindful of the judiciary's proper role in the scheme of separation of powers. These delicate jurisprudential efforts have given birth to the doctrine of standing.

Standing refers to "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." Black's Law Dictionary (9th ed. 2009). Ordinarily, courts invoke standing "to refuse to determine the merits of a legal claim, on the ground that . . . the litigant advancing it is not properly situated to be entitled to its judicial determination." 13A Charles Alan Wright et al., Federal Practice and Procedure § 3531, at 2 (3d ed. 2008). The Supreme Court has issued multitudinous opinions pertaining to standing. *Lujan* represents the Supreme Court's most polished and parsimonious distillation of the principles that these holdings embody. The *Lujan* Court held that standing entails three essential elements: (1) injury in fact; (2) causal connection between the injury and challenged conduct; and (3) reasonable likelihood that a favorable decision will redress the injury. 504 U.S. at 560–61. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561 (citations omitted).

One could characterize the injury-in-fact requirement as a first among equals. The Supreme Court has tendered various formulations of this requirement. Before *Lujan*, one could find the Supreme Court's most ubiquitous expression of injury of fact in *Baker v. Carr*, 369 U.S. 186, 204 (1962). The *Baker* Court wrote that standing obligates plaintiffs to "allege[] such a personal stake in the outcome of the controversy as to assure [] concrete adverseness." 369 U.S. at 204. *Lujan*'s definition of injury in fact mirrors *Baker*'s. The *Lujan* court defined injury in fact as the invasion of a legally protected interest that is "concrete and particularized." 504 U.S. at 560. In turn, the Court defined particularized as injury that "affect[s] the plaintiff in a personal and individual way." *Id.* n.1.

"Only a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit; a non-exclusive licensee does not." *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367–68 (Fed. Cir. 2008). The rule that nonexclusive licensees lack constitutional standing to sue has been characterized as "well-settled." *Intel. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001). "A nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement." *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) (citations omitted). This is because the nonexclusive licensee lacks the exclusive right to "make, use, and sell" the patents in suit. *See Penril Datacomm Networks, Inc. v. Rockwell Intern. Corp.*, 934 F. Supp. 708, 711 (D. Md. 1996).

2.      *Whether the 1991 Memo gives Dr. Tetzlaff an ownership interest in the patents in suit*

StemCells impugns the 1991 Memo as a barebones interoffice memo that, on its face, fails to give Dr. Tetzlaff an ownership interest in the patents in suit. StemCells likens the 1991 Memo to a profit-sharing agreement and maintains that the University of Calgary's IP policy in effect at the time strengthens this conclusion. Neuralstem makes essentially the opposite argument; that the 1991 Memo, read in conjunction with the IP policy, undoubtedly confers Dr. Tetzlaff an ownership interest in the invention that grew into the patents in suit. Noting that the 1991 Memo was executed in Canada by Canadian researchers, Neuralstem asserts that the Court must interpret the 1991 Memo under the Canadian common law of contract. *See, e.g.*, Doc. No. 203 at 9 n.4. StemCells does not dispute this assertion and, in fact, appears to concede its accuracy. *See* Doc. No. 232 at 24 n.11. Inexplicably, however, neither of the Parties makes an earnest attempt to state the Canadian common law of contract.

16

Be that as it may, the bottom line is that the 1991 Memo is ambiguous. The first half of the 1991 Memo states that it serves to "indicate the allotment of interest to the inventors of the above invention." Doc. No. 203-2 at 2. The Memo then allots 45% interests to Drs. Weiss and Reynolds and the remaining 10% to Dr. Tetzlaff. *Id.* The 1991 Memo refers to the "above invention" as a "Technique for Proliferation of Nerve Cells for Transplantation." *Id.* The second part of the Memo states that "[t]he inventors are in agreement with this assignment **which relates to 50% of any profits derived from this invention**, the other 50% being assigned to the University of Calgary through . . . the current policy relating to Intellectual Property." *Id.* (emphasis added).

There are two reasonable interpretations of this language. One is that the 1991 Memo creates ownership interests in the referenced invention in Drs. Weiss, Reynolds, and Tetzlaff and allocates them among the same. Granted, the second half of the Memo states that this allocation of interests "relates to 50% of any profits derived from this invention," which StemCells construes to mean that the "allotment of interests" is merely an allocation of half of the invention's profits among the named researchers in proportion to each allotted share of the interests. But this may be an unduly restrictive interpretation of the 1991 Memo. The signatories' intent in stating that the "allotment of interests" "relates to" 50% of any profits derived from the invention could have been to clarify that the allotment of interests applied to only 50% of the profits derived from the invention, as opposed to the full 100%. In other words, the signatories' intent could have been twofold: (1) to allocate ownership interests in the invention; and (2) to make clear that their respective ownership interests applied to only 50% of the profits derived from their invention.

That the key clause ("which relates to 50% of any profits derived from this invention") is nonrestrictive strengthens the reasonableness of this inference. The second half of the Memo reads: "The inventors are in agreement with this assignment[,] which relates to 50% of any profits derived from this invention, the other 50% being assigned to the University of Calgary . . . ." As this excerpt illustrates, the key clause is set off from the preceding clause by the function word "which" and an omitted comma, which arguably makes it a nonrestrictive clause. Merriam Webster's Online Dictionary defines nonrestrictive clause as "a descriptive clause that is not essential to the definiteness of the meaning of the words that it modifies." *Nonrestrictive clause*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/nonrestrictive%20clause (last visited Mar. 29, 2012). Therefore, the clause that the allocation of interests relates to 50% of the profits derived from the invention may, in essence, be superfluous. Thus, the 1991 Memo is facially ambiguous.

Resorting to extrinsic evidence fails to resolve this facial ambiguity. The Parties have set forth three primary sources of extrinsic evidence: (1) the IP policy; (2) the testimony and declarations of Drs. Weiss and Reynolds; (3) the consulting agreement in which Dr. Tetzlaff allegedly represents that he holds no ownership interest in the subject invention.

The 1988 IP policy lends considerable support to the proposition that Dr. Tetzlaff was an owner of the invention in question. StemCells characterizes the 1988 policy as "controlling" and Neuralstem does not appear to challenge this contention. The IP policy's preamble states that "[t]he University recognizes that the rights of **ownership** of such [intellectual] property are vested in the creators unless these rights are qualified by written agreements to the contrary." Doc. No. 214-4 at 2 (emphasis added). Likewise, § 3.1 states that "the author is the **owner** of the intellectual property that is the result of his/her scholarship." *Id.* at 3 § 3.1 (emphasis added).

18

Along those lines, § 2.2 states that "[w]here intellectual property is the product of more than one author, it shall be regarded as **jointly created and owned**, unless another arrangement exists among the authors." *Id.* at 3 § 2.2 (emphasis added). The policy defines "author" as "the creator of Intellectual Property," which may include "members of the academic staff." *Id.* at 2. The words "creator" and "inventor" are synonymous. *See Inventor Synonyms*, Thesaurus.com, http://thesaurus.com/browse/inventor?s=t (last visited Mar. 29, 2012). StemCells concedes this point. *See* Doc. No. 212 at 15 (using "inventor" as a synonym for "author" in discussing the meaning of author under the 1988 policy); *id.* at 16 n.9 (same); *see also* Doc. No. 203-3 at 3 § 3(b) (university's 1994 IP policy explicitly defines "creator" to include "inventors"). These provisions are stark and, assuming the applicability of the IP policy, strongly suggest that an ownership interest in the subject invention vested in Dr. Tetzlaff ab initio. As a matter of textual interpretation, StemCells has no meaningful response to these provisions. *See* Doc. No. at 15–17.

Drs. Weiss and Reynolds dispute that Dr. Tetzlaff coinvented the technology underlying the patents in suit. *See, e.g.*, Doc. No. 231-19 at 151; Doc. No. 231-6 at 2-4. However, neither Dr. Weiss nor Dr. Reynolds disputes that he signed the 1991 Memo. *See, e.g.*, Doc. No. 231-33 at 153. Furthermore, though they challenge the contention that Dr. Tetzlaff coinvented the subject technology, both Drs. Weiss and Reynolds concede that they "collaborated" with Dr. Tetzlaff on the same. *See, e.g.*, Doc. No. 23-6 at 3; Doc. No. 231-19 at 59–60. Moreover, the 1991 Memo expressly refers to Dr. Tetzlaff as an inventor. In short, these declarations draw Dr. Tetzlaff's inventive contribution to the subject patents into contention, thereby precluding a grant of summary judgment in favor of Neuralstem.

The August 1994 consulting agreement (1994 Consulting Agreement), for its part, weighs against the inference that the 1991 Memo conferred Dr. Tetzlaff an ownership interest in

the patents in suit. *See* Doc. No. 299-16. The 1994 Consulting Agreement is between

Neurospheres[5] and Dr. Tetzlaff and relates primarily to the identification, extraction, and

coordination of the shipping of primate neural tissue. *Id.* at 2 § 1.1. The 1994 Consulting

Agreement contains the following relevant language:

> Attached hereto as <u>Exhibit A</u>, the Consultant provides a list describing all
> **Inventions**, **original works of authorship**, developments, improvements and
> trade secrets that were **made by the Consultant prior to this contract** with the
> Company (collectively referred to as "Prior Inventions"), belong to the Consultant
> and relate to the Company's proposed business, products, or research and
> development; and which are not assigned to the Company hereunder. **If no such
> list is attached, the Consultant represents that there are no such Prior
> Inventions**.

*Id.* at 4 § 3.1.1 (some emphasis added). Evidently, Dr. Tetzlaff left Exhibit A blank. *Id.* at 8.

At a minimum, a reasonable juror could infer from this agreement that Dr. Tetzlaff did

not believe that he had an ownership interest in the invention in question. After all, the 1994

Consulting Agreement expressly states that the failure to list "[i]nventions" or "original works of

authorship" constitutes a representation there are no such "[p]rior [i]nventions." Neuralstem

contends that it is unclear how this language could "void" the 1991 Memo. Perhaps it could not

as a matter of law, but it is nevertheless probative of Dr. Tetzlaff's intent in executing the 1991

Memo. This is important because, as the preceding analysis has shown, the intent of the

researchers in executing the 1991 Memo is up in the air.

Presumably, Dr. Tetzlaff's testimony would be conducive to ascertaining where the truth

lies in the thicket of factual disputes into which the case has proliferated. Apparently, however,

neither Party has deposed Dr. Tetzlaff. Given that Neuralstem's standing challenge has uncorked

hundreds of pages of memoranda, Dr. Tetzlaff's apparent silence up to this point perplexes the

---

[5] Neurospheres was founded by Drs. Weiss and Reynolds, who hold a 49% interest in it.

Court. In any event, the 1994 Consulting Agreement unquestionably creates a genuine dispute of material fact regarding Dr. Tetzlaff's intent in signing the 1991 Memo.

The preceding discussion demonstrates two primary propositions: (1) the 1991 Memo is ambiguous; and (2) the available extrinsic evidence fails to resolve this ambiguity. Therefore, the Court denies the Parties' cross summary judgment motions in relation to the issue whether the 1991 Memo gives Dr. Tetzlaff an ownership interest in the patents in suit.

3.      *Whether the patent code's version of the bona fide purchaser defense voided Dr. Tetzlaff's putative ownership interest*

StemCells maintains that, even if the 1991 Memo made Dr. Tetzlaff a co-owner of the subject invention, Neuralstem's standing challenge fails in light of the patent code's version of the bona fide purchaser defense. This argument proceeds in several steps. One, StemCells asserts that only Drs. Weiss and Reynolds originally owned the subject invention because they are its inventors for the purposes of federal patent law. Second, they label the 1991 Memo as an "assignment" of a portion of their ownership interest to Dr. Tetzlaff. Third, StemCells traces, in considerable detail, the chain by which the ownership interest of Drs. Weiss and Reynolds was passed StemCells. According to StemCells, the early assignment history is as follows:



The succession of the ownership interests of Drs. Weiss and Reynolds has a second half. This is because, in StemCells' words, Drs. Weiss and Reynolds subsequently worked with Drs. Joseph Hammang and Edward Baetge and "their stem cell advances matured into multiple patent applications and issued patents." Doc. No. 232 at 3. StemCells produced this later assignment history as follows:



The last leg of the preceding graphic illustrates the fourth step in StemCells' bona fide

purchaser argument; StemCells' acquisition of what it purports to be an exclusive license to the

patents in suit. This transaction took place in October 2000 and—if one excludes the 2011

transfer between Dr. Tetzlaff and Neuralstem—stands as the ultimate manifestation of the

original ownership interests of Drs. Weiss and Reynolds.

The fifth step in StemCells' multifaceted argument is that it acquired its supposed

exclusive license without notice of Dr. Tetzlaff's ownership interest in the invention at issue.

Neuralstem vigorously disputes this averment, insisting that StemCells had inquiry notice of Dr.

Tetzlaff's ownership interest. The Court need not resolve this dispute as StemCells' bona fide

purchaser argument fails as a matter of law. The Court states in dicta, however, that the

proposition that StemCells assumed its rights in the patents in suit with inquiry notice of Dr.

Tetzlaff's ownership interest is dubious.[6]

The sixth, and final, step in StemCells' argument is that the patent code's codification of

the bona fide purchaser defense renders Dr. Tetzlaff's ownership interest void as against their

supposed exclusive license. *See* 35 U.S.C. § 261. Section 261 provides as follows: "An

assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee

for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark

Office within three months from its date or prior to the date of such subsequent purchase or

mortgage." *Id.*

StemCells maintains that, in view of the preceding five steps, it has satisfied the elements

of this provision. First, StemCells labels Dr. Tetzlaff's putative ownership interest as an

"assignment" and looks to language in the 1991 Memo thus terming the allotment of interests.

Second, based on the course of events, StemCells styles itself as a subsequent purchaser of the

---

[6] Neuralstem's argument that StemCells had inquiry notice of Dr. Tetzlaff's ownership interest boils down to three assertions: (1) StemCells (f/d/b/a Cytotherapeutics) knew Dr. Tetzlaff authored a paper with Drs. Weiss and Reynolds; (2) StemCells knew that Dr. Tetzlaff presented a research paper with, inter alios, Drs. Weiss and Reynolds; and (3) Neurospheres' founders (i.e. Drs. Weiss and Reynolds) knew about Dr. Tetzlaff's ownership interest. The first assertion fails to create a reasonable inference that StemCells had inquiry notice of the 1991 Memo because "authorship of an article by itself does not raise a presumption of inventorship with respect to the subject matter disclosed in the article." *In re Katz*, 687 F.2d 450, 455 (C.C.P.A. 1982). The second assertion is immaterial for similar reasons. Any number of persons, including undergraduate students, could contribute to and present on a research article. To assume that (1) the subject matter of the article would blossom into an invention and (2) the dozen or so authors who presented on it would own the invention requires an long leap of logic. The third assertion is also insubstantial. Although Neurospheres, through Drs. Weiss and Reynolds, presumably knew about the 1991 Memo, Neurospheres is a separate entity from StemCells. Therefore, one cannot impute Neurospheres' knowledge of the 1991 Memo to StemCells as a matter of law. Moreover,  StemCells has submitted considerable evidence showing that, even though the subject of Dr. Tetzlaff's potential coinventorship arose during the prosecution of the patents in suit, it conducted due diligence to ensure that no such interest existed. Indeed, by dint of the named inventors' declarations, the USPTO determined that Dr. Tetzlaff held no interest in the patents. Therefore, were the Court to reach the question, the Court would most likely hold that no reasonable juror could conclude that StemCells acquired its rights in the patents in suit with inquiry notice of the 1991 Memo and the ownership interest it supposedly creates.

rights in the patents. In other words, StemCells acquired its supposed exclusive license after Dr. Tetzlaff signed the 1991 Memo. Third, as the Court has determined, StemCells contends that it acquired its rights without notice of the 1991 Memo. Fourth, StemCells observes that Dr. Tetzlaff never recorded his assignment at the USPTO. For these reasons, StemCells urges the Court to grant summary judgment in its favor on standing.

This argument, while made in good faith, is specious. Its salient flaw is that it ignores the fact that the bona fide purchaser rule is an affirmative defense. *See, e.g.*, *Duncan Townsite Co. v. Lane*, 245 U.S. 308, 311 (1917); *Krueger v. United States*, 246 U.S. 69, 78–79 (1918). Aptly, the *Lane* Court described the bona fide purchaser rule as "a shield by which the purchaser of a legal title may protect himself against the holder of an equity, not a sword by which the owner of an equity may overcome the holder of both the legal title and an equity." *Lane*, 245 U.S. at 311 (citation omitted).

*Krueger* is likewise illustrative. In *Krueger*, the United States sued the defendant (Krueger), alleging that Krueger's patent on public lands was procured through the fraud of, inter alios, Krueger's husband. *Krueger*, 246 U.S. at 73. Krueger defended on the ground that her husband conveyed the land patent to her without notice of her husband's fraud. *Id.* at 73–74. The *Krueger* Court held that Krueger had constructive notice of the fraud and therefore affirmed the court of appeals' decision against her. *Id.* at 79. In so holding, the *Krueger* Court stated that "[t]he defense of bona fide purchaser is an affirmative one, and the burden was upon Mrs. Krueger to establish it in order to defeat the right of the government to have a cancellation of the patent, fraudulently obtained." *Id.* at 78 (citing *Blodgett Co. v. United States*, 236 U. S. 397, 403–04 (1915); *Great N. Ry. Co. v. Hower*, 236 U. S. 702 (1915)).

Modern authority is in accord with this longstanding rule. *See, e.g.*, *Rhône-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323 (Fed. Cir. 2002). In *Rhône-Poulenc*, the issue was whether a nonexclusive licensee could assert the bona fide purchaser defense. *Id.* at 1325. The plaintiff (Rhône-Poulenc Agro, or RPA) patented a peptide that was useful in growing herbicide resistant corn plants. *Id.* Through an agreement, RPA licensed the patent to DeKalb, who, in turn, sublicensed it to Monsato. *Id.* RPA sued DeKalb and Monsato. *Id.* at 1326. RPA sought to revoke the agreement on the ground that DeKalb had procured it through fraud. RPA also asserted a patent infringement claim against Monsato. *Id.*

Monsato defended on the ground that it was a bona fide purchaser, and the district court granted summary judgment in its favor. *Id.* at 1325–26. The *Rhône-Poulenc* court reversed, holding that "the bona fide purchaser **defense** does not apply to non-exclusive licensees." *Id.* at 1334 (emphasis added). In coming to this conclusion, the court consistently called the bona fide purchaser rule a "defense." *See generally id.* Consistent with *Lane* and the related line of "distant" Supreme Court cases, nowhere does the *Rhône-Poulenc* court suggest that plaintiffs can use § 261 offensively, such as to establish an essential element of their claim. *See generally id.*; *see also V-Formation, Inc. v. Benetton Grp. SpA*, No. 02 CV 02259 PSF CBS, 2006 WL 650374, at *8 (D. Colo. Mar. 10, 2006) (reading *Rhône-Poulenc* for the proposition that a plaintiff with legal title to a patent—as opposed to a mere license—may not use § 261 to undo the defendant's rights in patented technology).

In this case, StemCells attempts to make impermissible offensive use of § 261. StemCells is the plaintiff and has sued Neuralstem for, inter alia, patent infringement. As plaintiff, StemCells bears the burden of proving standing. Therefore, in asserting the bona fide purchaser defense to Neuralstem's standing challenge, StemCells effectively endeavors to use the bona fide

purchaser defense to establish an essential element of its case. It well-established, however, that the bona fide purchaser defense is only "a shield by which the purchaser of a legal title may protect himself against the holder of an equity, not a sword by which the owner of an equity may overcome the holder of both the legal title and an equity." StemCells replies that it does not use § 261 as a sword because Neuralstem has challenged its standing. This response misses the point: StemCells bears the burden of proving standing no matter who has raised it. The Court could have raised the issue of standing sua sponte. StemCells has identified no authority proposing that a plaintiff may use § 261 to establish its constitutional capacity to sue and the cases discussed above militate strongly against this conclusion.

A firmly rooted principle of statutory construction supports this conclusion. It is well-settled that courts "presume legislatures act with case law in mind." *See, e.g.*, *Abuelhawa v. United States*, 129 S. Ct. 2102, 2106 (2009) (citing *Williams v. Taylor*, 529 U.S. 362, 380–81 & n.12 (2000)). Congress enacted the current version of § 261 in 1870. *In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1048 (9th Cir. 2001). The Supreme Court had established before this date that the bona fide purchaser rule was an affirmative defense. *See, e.g.*, *Smith v. Orton*, No. 80, 1866 WL 9300, at *2–3 (U.S. Jan. 15, 1866) (referring to the bona fide purchaser rule as a "defence"); *Piatt v. Vattier*, 34 U.S. 405, 414 (1835) (same). Although the late professor Bogert purports to identify authority to the contrary, *see* George Gleason Bogert et al., The Law Of Trusts And Trustees § 885 n.37 (citations omitted), the state cases he locates were decided in the 1950s, some eighty years after Congress passed the current version of § 261. In short, the statutory history of § 261 buttresses the inference that Congress did not intend for plaintiffs to be able to use § 261 offensively to prove standing.

Even if plaintiffs could use the bona fide purchaser defense to prove standing, summary judgment in favor of StemCells on this score would still be inappropriate. As discussed in Part III.C.2, *supra*, genuine disputes of material fact engulf Dr. Tetzlaff's status vel non as a co-owner of the at-issue invention. Dr. Tetzlaff's co-ownership of the invention in question may preclude the applicability of § 261. By its terms, § 261 applies to assignments, grants, and conveyances. On the current factual record, it is unclear that the 1991 Memo, construed against the backdrop of the 1988 IP policy, constituted such an assignment, grant, or conveyance. It is equally plausible that ownership in the subject invention vested in Dr. Tetzlaff ab initio. Neuralstem submits its own graphic to illustrate this scenario:



*Rhône-Poulenc* lends support to the conclusion that Dr. Tetzlaff's co-ownership of the intellectual property would preclude the application of § 261. The *Rhône-Poulenc* court wrote that §261 "is by its terms limited to situations in which the patent **owner** makes inconsistent assignments, grants, or conveyances to two entities, and the question is whether the later assignee should prevail." *Rhône-Poulenc*, 284 F.3d at 1327 (emphasis added). Here, Neuralstem contends that Dr. Tetzlaff, as putative co-owner, made no such inconsistent assignment. Assuming the validity of Neuralstem's view of the meaning of the 1991 Memo, the Court would struggle to gainsay this conclusion. Accordingly, at an absolute minimum, the deep factual disputes the case presents would preclude summary judgment in favor of StemCells on its § 261 argument.

To recap, the preceding analysis shows that, as a matter of law, § 261 could not void Dr. Tetzlaff's putative ownership interest in the patents in suit. Alternatively, the discussion demonstrates that factual disputes cast doubt on § 261's applicability. As a result, the Court denies, with prejudice, StemCells' Motion for Summary Judgment on Standing in relation to its § 261 argument.

**D.     Motion to Dismiss**

Neuralstem's Motion to Dismiss on standing grounds is moot. The Court denied Neuralstem's Cross-Motion for Partial Summary Judgment on Standing in the preceding unit of analysis. It follows a fortiori that StemCells has stated a facially plausible claim that it has standing to prosecute its patent infringement action. Accordingly, the Court denies as moot Neuralstem's Motion to Dismiss.

E.      **Motion for Reconsideration**

As mentioned above, StemCells' filed a Motion for Reconsideration of the Court's Claim Construction. Therein, StemCells moves the Court to reconsider its construction of the terms "adherent" and "of." It is improvident to address said Motion at this time because Neuralstem has attacked StemCells' standing to maintain its patent infringement suit. If Neuralstem prevails on its standing challenge, the Court will likely have to dismiss StemCells' patent infringement claims; in this event, the Court's reconsideration of its claim construction will have been useless. Considering the complexity of the technology this case entails, the Court is hesitant to issue what may amount to an advisory opinion. Therefore, the Court holds StemCells' Motion for Reconsideration in abeyance pending the resolution of Neuralstem's standing challenge.

IV.     **CONCLUSION**

For the foregoing reasons, the Court takes the following action with respect to the outstanding motions. The Court: (1) **GRANTS** Defendants'  Motion for Leave to File a First Amended Answer and Counterclaims; (2) **DENIES AS MOOT** Defendants' Motion to Dismiss; (3) **DENIES** Plaintiffs' Motion for Summary Judgment on Standing; (4) **DENIES** Defendants' Cross-Motion for Partial Summary Judgment on Standing; (5) **HOLDS IN ABEYANCE** Plaintiffs' Motion for Reconsideration of the Court's Claim Construction; (6) **GRANTS** Defendants' Motion to Supplement the Record in Support of their Cross-Motion for Partial Summary Judgment on Standing; and (7) **GRANTS** Plaintiffs' Cross-Motion to Supplement the Record in Support of their Motion for Summary Judgment on Standing.

The Court will issue a separate Order containing, inter alia, instructions on how the Parties should proceed in light of this Memorandum Opinion.


|   April 6, 2012   |                  /s/                  |
| :---: | :---: |
| Date | Alexander Williams, Jr. |
|  | United States District Judge |